## CENTRAL ILLINOIS PUBLIC SERVICE CO. *v.* UNITED STATES

No. 76–1058. Argued October 12, 1977—Decided February 28, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a concurring opinion, in which BURGER, C. J., and POWELL, J., joined, *post*, p. 33. POWELL, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 38. STEWART, J., filed an opinion concurring in the judgment, *post*, p. 39.

*Sharon L. King* argued the cause and filed briefs for petitioner.

*Stuart A. Smith* argued the cause for the United States. With him on the brief were *Solicitor General McCree* and *Assistant Attorney General Ferguson.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether an employer, who in 1963 reimbursed lunch expenses of employees who were on company travel but not away overnight, must withhold federal income tax on those reimbursements. Stated another way, the issue is whether the lunch reimbursements qualify as

---

**David W. Richmond* filed a brief for the American Gas Assn. as *amicus curiae.*

"wages" under § 3401 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 3401 (a).

I

The facts are not in any real dispute. Petitioner Central Illinois Public Service Company (Company) is a regulated public utility engaged, in downstate Illinois, in the generation, transmission, distribution, and sale of electric energy, and in the distribution and sale of natural gas. Its principal office is in Springfield. It serves a geographic area of some size. In order adequately to serve the area, the Company, in accord with long-established policy, reimburses its employees for reasonable, legitimate expenses of transportation, meals, and lodging they incur in travel on the Company's business. Some of these trips are overnight; on others, the employees return before the end of the business day.

In 1963, the tax year in issue, the Company had approximately 1,900 employees. It reimbursed its union employees and the operating employees of its western division (its only nonunionized division) for noon lunches consumed, while on authorized travel, in an amount not to exceed $1.40 per lunch.[1] The amount was specified in the Company's collective-bargaining agreement with the union. Other salaried employees were reimbursed for actual reasonable luncheon expenses up to a specified maximum amount.[2]

An employee on an authorized trip prepared his expense account on a company form. This was turned in to his supervisor for approval. The $1.40 rate sometimes was in excess of the actual lunch cost, but at other times it was insufficient to

---

[1] In 1960 the noon meal reimbursement was $1.30. In 1961 the union negotiated an increase to $1.40. Tr. 93.

[2] The Company's controller testified that the expense accounts of employees entitled to reimbursement for actual amounts expended were carefully reviewed, were often regarded as questionable ($2.50, at the trial date, was considered questionable), and were disallowed if deemed not to be reasonable. Id., at 64–66.

cover that cost. An employee who took lunch from home with him on a company trip was entitled to reimbursement. If, because of the locality of his work assignment on a particular day, the employee went home for lunch, he was not entitled to reimbursement. Many employees were engaged in open-air labor. Even in 1963 the $1.40 rate was "modest." [3]

The employee on travel status rendered no service to the Company during his lunch. He was off duty and on his own time. He was subject to call, however, as were all employees at any time as emergencies required. The lunch payment was unrelated to the employee's specific job title, the nature of his work, or his rate of pay. "[T]his lunch payment arrangement was beneficial and convenient for the company and served its business interest. It saved the company employee time otherwise spent in travelling back and forth as well as the usual travel expenses." [4]

During 1963 the Company paid its employees a total of $139,936.12 in reimbursement for noon lunches consumed while away from normal duty stations on nonovernight trips. It did not withhold federal income tax for its employees with respect to the components of this sum. The Company in 1963, however, did withhold and pay federal income withholding taxes totaling $1,966,489.87 with respect to other employee payments.

Upon audit in 1971, the Internal Revenue Service took the position that the lunch reimbursements in 1963 qualified as wages subject to withholding. A deficiency of $25,188.50 in withholding taxes was assessed. The Company promptly paid this deficiency together with $11,427.22 interest thereon, a total of $36,615.72. It then immediately filed its claim for

---

[3] The District Court in its findings, in addition to describing the rate as "modest," observed: "As a practical matter, it could hardly be considered a money making proposition for an employee." 405 F. Supp. 748, 749 (SD Ill. 1975).

[4] Ibid.

refund of the total amount so paid and, with no action forthcoming on the claim for six months, see 26 U. S. C. § 6532 (a) (1), instituted this suit in the United States District Court for the Southern District of Illinois to recover the amount so paid.

The District Court ruled in the Company's favor, holding that the reimbursements in question were not wages subject to withholding. 405 F. Supp. 748 (1975). The United States Court of Appeals for the Seventh Circuit reversed. 540 F. 2d 300 (1976). Because that decision appeared to be in conflict with the views and decision of the Fourth Circuit in *Royster Co.* v. *United States,* 479 F. 2d 387 (1973), we granted certiorari. 431 U. S. 903 (1977).

## II

In *Commissioner* v. *Kowalski,* 434 U. S. 77 (1977), decided earlier this Term, the Court held that New Jersey's cash reimbursements to its highway patrol officers for meals consumed while on patrol duty constituted income to the officers, within the broad definition of gross income under § 61 (a) of the 1954 Code, 26 U. S. C. § 61 (a), and, further, that those cash payments were not excludable under § 119 of the Code, 26 U. S. C. § 119, relating to meals or lodging furnished for the convenience of the employer.

*Kowalski,* however, concerned the federal income tax and the issue of what was income. Its pertinency for the present withholding tax litigation is necessarily confined to the income tax aspects of the lunch reimbursements to the Company's employees.

The income tax issue is not before us in this case. We are confronted here, instead, with the question whether the lunch reimbursements, even though now they may be held to constitute taxable income to the employees who are reimbursed, are or are not "wages" subject to withholding, within the meaning and requirements of §§ 3401–3403 of the Code, 26 U. S. C. §§ 3401–3403 (1970 ed. and Supp. V). These withholding

statutes are in Subtitle C of the Code. The income tax provisions constitute Subtitle A.

The income tax is imposed on taxable income. 26 U. S. C. § 1. Generally, this is gross income minus allowable deductions. 26 U. S. C. § 63 (a). Section 61 (a) defines as gross income "all income from whatever source derived" including, under § 61 (a)(1), "[c]ompensation for services." The withholding tax, in some contrast, is confined to wages, § 3402 (a), and § 3401 (a) defines as "wages," "all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash." The two concepts—income and wages—obviously are not necessarily the same. Wages usually are income,[5] but many items qualify as income and yet clearly are not wages. Interest, rent, and dividends are ready examples. And the very definition of "wages" in § 3401 (a) itself goes on specifically to exclude certain types of remuneration for an employee's services to his employer (e. g., combat pay, agricultural labor, certain domestic service). Our task, therefore, is to determine the character of the lunch reimbursements in the light of the definition of "wages" in § 3401 (a), and the Company's consequent obligation to withhold under § 3402 (a).

Before we proceed to the resolution of that issue, however, one further observation about the income tax aspect of lunch reimbursements is in order. Although *United States* v. *Correll*, 389 U. S. 299 (1967), restricting to overnight trips the travel expense deduction for meal costs under § 162 (a)(2), dispelled some of the confusion, it is fair to say that until this Court's very recent decision in *Kowalski*, the Courts of Appeals have been in disarray on the issue whether, under §§ 61 and 119 of the 1954 Code or under the respective predecessor sections of the 1939 Code, such reimbursements were income

---

[5] There are exceptions. *E. g.*, 26 U. S. C. § 911 (a).

at all to the recipients.[6]   Thus, even the income tax character of lunch reimbursements was not yet partially clarified before the end of 1967, four full years after the tax year for which withholding taxes on lunch reimbursements are now being claimed from the Company in the present case, and were not entirely clarified until the *Kowalski* decision a few weeks ago.

## III

The Sixteenth, or income tax, Amendment to the Constitution of the United States became effective in February 1913. The ensuing Tariff Act of October 3, 1913, § IIE, 38 Stat. 170, contained, perhaps somewhat surprisingly, a fairly expansive withholding provision.[7]   This, however, was repealed[8] and in due course came to be replaced with the predecessor of the current "information at the source" provisions constituting § 6041 *et seq.* of the 1954 Code, 26 U. S. C. § 6041 *et seq.*

The present withholding system has a later origin in the Victory Tax imposed by the Revenue Act of 1942, § 172, 56 Stat. 884.   This, with its then new § 465 (b) of the 1939 Code, embraced the basic definition of "wages" now contained in

---

[6] *E. g., Wilson* v. *United States,* 412 F. 2d 694 (CA1 1969); *Commissioner* v. *Bagley,* 374 F. 2d 204 (CA1 1967), cert. denied, 389 U. S. 1046 (1968); *Saunders* v. *Commissioner,* 215 F. 2d 768 (CA3 1954); *Koerner* v. *United States,* 550 F. 2d 1362 (CA4), cert. denied, 434 U. S. 984 (1977); *Smith* v. *United States,* 543 F. 2d 1155 (CA5 1976), vacated and remanded, 434 U. S. 978 (1977); *United States* v. *Barrett,* 321 F. 2d 911 (CA5 1963); *Magness* v. *Commissioner,* 247 F. 2d 740 (CA5 1957), cert. denied, 355 U. S. 931 (1958); *Correll* v. *United States,* 369 F. 2d 87 (CA6 1966), rev'd, 389 U. S. 299 (1967); *United States* v. *Morelan,* 356 F. 2d 199 (CA8 1966); *Hanson* v. *Commissioner,* 298 F. 2d 391 (CA8 1962); *United States* v. *Keeton,* 383 F. 2d 429 (CA10 1967).

[7] "All persons . . . [or] corporations . . . having the control . . . or payment of . . . salaries [or] wages . . . of another person, exceeding $3,000 for any taxable year . . . are hereby authorized and required to deduct and withhold from such . . . income such sum as will be sufficient to pay the normal tax imposed thereon by this section . . . ."

[8] Act of Oct. 3, 1917, § 1204 (2), 40 Stat. 300.

§ 3401 (a) of the 1954 Code.   The Victory Tax was replaced by the Current Tax Payment Act of 1943, 57 Stat. 126, and was repealed by the Individual Income Tax Act of 1944, § 6 (a), 58 Stat. 234.   The structure of the 1943 Act survives to the present day.

In this legislation of 35 years ago Congress chose not to return to the inclusive language of the Tariff Act of 1913, but, specifically, "in the interest of simplicity and ease of administration," confined the obligation to withhold to "salaries, wages, and other forms of compensation for personal services." S. Rep. No. 1631, 77th Cong., 2d Sess., 165 (1942).[9]   The committee reports of the time stated consistently that "wages" meant remuneration *"if* paid for services performed by an employee for his employer" (emphasis supplied).   H. R. Rep. No. 2333, 77th Cong., 2d Sess., 126 (1942); S. Rep. No. 1631, 77th Cong., 2d Sess., 166 (1942); H. R. Rep. No. 401, 78th Cong., 1st Sess., 22 (1943); S. Rep. No. 221, 78th Cong., 1st Sess., 17 (1943); H. R. Rep. No. 510, 78th Cong., 1st Sess., 29 (1943).

The current regulations also contain the "if" clause, Treas. Reg. on Employment Taxes, § 31.3401 (a)–1(a)(2), 26 CFR § 31.3401 (a)–1(a)(2) (1977), and then, in § 31.3401 (a)–1 (b)(2) recite: "Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages and are not subject to withholding."   But § 31.3401 (a)–1(b)(9) provides: "The value of any meals or lodging furnished to an employee by his employer is not subject to withholding if the value of the meals or lodging is excludable from the gross income of the employee.   See § 1.119–1 of this chapter (Income Tax Regulations)."

---

[9] The House would have included withholding on dividends and bond interest as well as wages.   H. R. Rep. No. 2333, 77th Cong., 2d Sess., 125 (1942).

The Internal Revenue Service by its Regulations thus now would tie the withholding obligation of the employer to the income tax result for the employee.

## IV

The Government, straightforwardly and simplistically, argues that the definition of "wages" in § 3401 (a) corresponds to the first category of gross income set forth in § 61 (a)(1), and that the two statutes "although not entirely congruent [in their] relationship," Brief for United States 11, have "equivalent scope," *id.*, at 15. It is claimed that the meal allowance was compensatory, for it was paid for the performance of assigned service at the place the employer determined. Thus, it is said, there was a direct causal connection between the receipt of the allowance and the performance of services. The allowance, then, was part of a total package of remuneration designed to attract and hold the employee to the Company. The Government further argues that this is in accord with the Court's pronouncements as to what is compensation for purposes of the tax statutes. It states that § 3401 (a) broadly defines "wages," and it cites *Old Colony Trust Co.* v. *Commissioner,* 279 U. S. 716 (1929), where the Court held employees taxable for the amount of their income taxes paid by their employers; *Commissioner* v. *LoBue,* 351 U. S. 243 (1956), where the transfer of assets to an employee at less than fair market value in order to secure better service was held to result in taxable income to the employee; *Social Security Board* v. *Nierotko,* 327 U. S. 358 (1946), where the definition of wages under the Social Security Act was at issue; and *Otte* v. *United States,* 419 U. S. 43, 49–50 (1974), which concerned the payment of wage claims by a trustee in bankruptcy. For purposes of the tax law, the Government argues, there is no difference between benefits of this kind and traditional wage or salary payments. Both are "[c]ompensation for services" under § 61 (a)(1) and "remuneration . . . for

services" under § 3401 (a). It would explain away the seemingly pertinent Treas. Reg. § 31.3401 (a)–1(b)(2) on the ground that it relates only to business expenses that are deductible under § 162 (a) of the Code, and that *Correll* excluded from the benefit of § 162 (a) the cost of meals consumed during nonovernight travel. And it urges that what is important is that the payments at issue were a result of the employment relationship and were a part of the total of the personal benefits that arose out of that relationship.

## V

We do not agree with this rather facile conclusion advanced by the Government. The case, of course, would flow in the Government's favor if the mere fact that the reimbursements were made in the context of the employer-employee relationship were to govern the withholding tax result. That they were so paid is obvious. But it is one thing to say that the reimbursements constitute income to the employees for income tax purposes, and it is quite another thing to say that it follows therefrom that the reimbursements in 1963 were subject to withholding. There is a gap between the premise and the conclusion and it is a wide one. Considerations that support subjectability to the income tax are not necessarily the same as the considerations that support withholding. To require the employee to carry the risk of his own tax liability is not the same as to require the employer to carry the risk of the tax liability of its employee. Required withholding, therefore, is rightly much narrower than subjectability to income taxation.

As we have noted above, withholding, under § 3402, is required only upon wages, and § 3401 (a) defines wages as "all remuneration . . . for services performed by an employee for his employer." When the withholding system was effectuated in 1942, the obligation was confined to wages, and the like, "in the interest of simplicity and ease of administration."

S. Rep. No. 1631, 77th Cong., 2d Sess., 165 (1942). And what is now Treas. Reg. § 31.3401 (a)–1(b)(2), applicable to employers and excluding from the concepts of wages and of withholding amounts "paid specifically . . . for traveling or other bona fide ordinary and necessary expenses incurred . . . in the business of the employer," was issued originally—long prior to the *Correll* decision in 1967—as § 404.14 of T. D. 5277, 1943 Cum. Bull. 927, 941.[10] There is nothing in *Correll* that relates to the withholding provisions, and there is nothing in Treas. Reg. § 31.3401 (a)–1(b)(2) that incorporates any overnight concept. This is so despite the Government's assertion that "consistently" since 1940, that is, since I. T. 3395, 1940–2 Cum. Bull. 64 (relating to railroad employees and their deducting the cost of room rentals and meals for necessary rest while away from home), it has adhered to the overnight rule in determining income tax liability. Brief for United States 32. Such consistent adherence to the overnight rule in determining income tax liability—together with the consistent absence of any reference to the overnight rule in the withholding regulations—strongly indicates that it was intended that the overnight rule not apply in determining withholding tax obligations.

---

[10] Similarly, Treas. Reg. § 31.3401 (a)–1 (b) (10), promulgated originally as § 404.15 of T. D. 5277, excluded from "wages" facilities and privileges (such as entertainment, medical services, and courtesy discounts) offered by the employer. Yet those, obviously, are also offered in the employer-employee relationship. See S. Rep. No. 830, 88th Cong., 2d Sess., 208 (1964); H. R. Rep. No. 1149, 88th Cong., 2d Sess., 22 (1964); S. Rep. No. 91–552, p. 110 (1969); H. R. Rep. No. 91–413, p. 77 (1969). See also Rev. Rul. 55–520, 1955–2 Cum. Bull. 393; Rev. Rul. 56–249, 1956–1 Cum. Bull. 488; Rev. Rul. 58–301, 1958–1 Cum. Bull. 23; Rev. Rul. 58–145, 1958–1 Cum. Bull. 360; and Rev. Rul. 59–227, 1959–2 Cum. Bull. 13, modified and superseded prospectively by Rev. Rul. 75–44, 1975–1 Cum. Bull. 15, for other instances of payments made in the employer-employee relationship where withholding was not required despite includability for income tax purposes.

Decided cases have made the distinction between wages and income and have refused to equate the two in withholding or similar controversies. *Peoples Life Ins. Co.* v. *United States,* 179 Ct. Cl. 318, 332, 373 F. 2d 924, 932 (1967); *Humble Pipe Line Co.* v. *United States,* 194 Ct. Cl. 944, 950, 442 F. 2d 1353, 1356 (1971); *Humble Oil & Refining Co.* v. *United States,* 194 Ct. Cl. 920, 442 F. 2d 1362 (1971); *Stubbs, Overbeck & Associates* v. *United States,* 445 F. 2d 1142 (CA5 1971); *Royster Co.* v. *United States,* 479 F. 2d, at 390;[11] *Acacia Mutual Life Ins. Co.* v. *United States,* 272 F. Supp. 188 (Md. 1967). The Government would distinguish these cases on the ground that some of them involved overnight travel, the expenses of which would be deductible, and that others were concerned with particularized allowances. We perceive the distinctions but are not persuaded that they blunt the basic difference between the wage and the income concepts the respective courts have emphasized.

An expansive and sweeping definition of wages, such as was indulged in by the Court of Appeals, 540 F. 2d, at 302, and is urged by the Government here, is not consistent with the existing withholding system. As noted above, Congress chose simplicity, ease of administration, and confinement to wages as the standard in 1942. This was a standard that was intentionally narrow and precise. It has not been changed by Congress since 1942, although, of course, as is often the case, administrative and other pressures seek to soften and stretch the definition. Because the employer is in a secondary position as to liability for any tax of the employee, it is a matter of obvious concern that, absent further specific congressional action, the employer's obligation to withhold be precise and not speculative. See *Humble Oil & Refining Co.* v. *United*

---

[11] In the District Court in the *Royster* case, the Government abandoned its position that the income tax provisions of the Code were *in pari materia* with the withholding provisions. See 479 F. 2d, at 388.

*States,* 194 Ct. Cl., at 933, 442 F. 2d, at 1369–1370. See also H. R. Rep. No. 94–1515, p. 489 (1976).[12]

In 1963 not one regulation or ruling required withholding on any travel expense reimbursement. The intimation was quite the other way. See Treas. Reg. § 31–3401 (a)–1(b)(2). No employer, in viewing the regulations in 1963, could reasonably suspect that a withholding obligation existed. The 1940 ruling upon which the Government would erect its case, I. T. 3395, 1940–2 Cum. Bull. 64, predated the withholding regulations of 1943. Apart from the fact that this was a deduction ruling, it is also significant that the Government did not reflect it in its withholding regulations adopted shortly thereafter. With this omission on the part of the Government, it is hardly reasonable to require an employer to fill the gap on its own account. Further, in 1963 and for some time thereafter all judicial decisions were the other way, even on the deductibility issue. Only with *Correll,* decided by this Court in 1967, was there a ruling of nondeductibility. And until the Court of Appeals' decision in the present case, no court had ever held lunch reimbursements to be wages for withholding purposes. The first published pronouncement by the Internal Revenue Service with respect to withholding came only in 1969 with Rev. Rul. 69–592, 1969–2 Cum. Bull. 193, shortly after *Correll* came down. That Ruling's suggestion that withholding was a possible requirement (when reimbursed travel expenses exceeded travel deductions) contained no reference whatsoever to wages, and thus avoided any mention of the statutory requirement that the payment must be a wage to be subject to withholding.

---

[12] An imposition of withholding responsibility on the Company for the lunch reimbursements as far back as 1963 strikes us as somewhat retroactive in character and almost punitive in the light of the facts of this case.

Needless to say, we do not decide today whether a new regulation that, for withholding purposes, would require the treatment of lunch reimbursements as wages under the existing statute would or would not be valid.

This is not to say, of course, that the Congress may not subject lunch reimbursements to withholding if in its wisdom it chooses to do so by expanding the definition of wages for withholding. It has not done so as yet. And we cannot justify the Government's attempt to do so by judicial determination.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and MR. JUSTICE POWELL join, concurring.

I join the Court's opinion, emphasizing that it does not decide "whether a new regulation that, for withholding purposes, would require the treatment of lunch reimbursements as wages under the existing statute would or would not be valid." *Ante,* at 32 n. 12. I share the Court's conclusion that petitioner met its obligations under Treas. Reg. § 31.3401 (a)–1 (b)(2) as that regulation was most reasonably interpreted in 1963. I write separately to state more fully my views on why petitioner cannot be subjected *retroactively* to withholding tax on the theory—whether correct or not—espoused here by the Government. See *ante,* at 28–29.

I

Those who administer the Internal Revenue Code unquestionably have broad authority to make tax rulings and regulations retroactive. See 26 U. S. C. § 7805 (b),[1] construed in *Dixon* v. *United States,* 381 U. S. 68 (1965); *Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180

---

[1] "(b) Retroactivity of regulations or rulings.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

(1957).[2]   That authority is not unfettered, however, and conditions are present here that would make retroactive application of the withholding tax to petitioner's lunch payments an abuse of discretion.

The legislative history of the Internal Revenue Code does not reveal any evidence of congressional intent to make employers guarantors of the tax liabilities of their employees, which would in all likelihood be the result if withholding taxes can be assessed retroactively.[3]   Far from it.   When Congress has changed the withholding provisions to enlarge the scope of

---

[2] This case is very unlike either *Dixon* or *Automobile Club of Michigan* in each of which the Commissioner was held authorized to correct what we characterized as "mistakes of law." See 381 U. S., at 72; 353 U. S., at 183, 184. There is no simple sense in which the Commissioner is here merely undoing a mistake of law. Instead, as the Commissioner's recent withdrawal of his fringe-benefit regulations witnesses, 41 Fed. Reg. 56334 (1976), the bifurcation of payments made to employees by employers into those that are fringe benefits—and hence income and hence taxable—and those that are merely reimbursements of moneys expended by the employee for the benefit of the employer's business—and hence are a cost of doing business as an employee and hence excludable or deductible from income—is by no means easy. In the field of fringe-benefit taxation, therefore, the fact that something is taxed today that was not taxed yesterday is not so much evidence of mistake corrected as of an evolving understanding of what changed circumstances, equity, and legislative purpose require. And, although I feel no compulsion to insist that fringe-benefit law must always have been as it is newly announced on the theory that administrative interpretation must reflect a constant congressional intent, cf. *Dixon* v. *United States, supra,* at 73–75, I of course do not suggest that the Commissioner's power to define income or wages is unfettered. It will be time enough to consider whether any particular fringe-benefit regulation is valid when and if such a regulation comes before this Court.

[3] It is possible that the employer could sue each of his employees to recover the amount of withholding taxes retroactively assessed by the Government. The chance that such a method of recovery would be either practical or cost effective is remote, however.

the withholding base or to increase the tax rate, its uniform practice has been to give employers a grace period in which to bring their withholding practices in line with the new law.[4]

[4] One of the first instances of this policy can be found in the Revenue Act of 1942 itself. There, Congress raised the witholding tax rate on payments made to nonresident aliens and foreign corporations, see Internal Revenue Code of 1939, §§ 143–144, 53 Stat. 60–62, but nonetheless delayed the effective date of the increase

"until the tenth day after the enactment of the act in order to afford a reasonable period within which withholding agents will be informed of the higher rate applicable to payments made to nonresident aliens or nonresident foreign corporations." S. Rep. No. 1631, 77th Cong., 2d Sess., 69 (1942); see Revenue Act of 1942, § 108 (c), 56 Stat. 808.

Similarly withholding for the Victory Tax did not commence until tax years beginning after December 31, 1942, see id., § 172 (a), 56 Stat. 884, although the Tax was passed in October 1942. Section 2 (c) of the Current Tax Payment Act of 1943, 57 Stat. 139, also delayed imposition of modified withholding obligations for about three weeks.

A review of amendments to the withholding provisions of the 1954 Code reveals a uniform practice of prospective application of modifications to the withholding tax that would require an employer to withhold increased amounts from employees' pay.

The first such amendment to § 3401 is found in § 213 of Title II of the Revenue Act of 1964, which clarified and in some cases expanded the tax liability of employees for moving expenses and modified withholding correspondingly. See Tit. II, §§ 213 (a), 213 (c), 78 Stat. 50–52, adding respectively, 26 U. S. C. §§ 217 and 3401 (a) (15). Congress, apparently recognizing that additional withholding might be required, stated in § 213 (d): "The amendment made by subsection (c) shall apply with respect to remuneration paid after the seventh day following the date of enactment of this Act." 78 Stat. 52. By contrast, § 204 of the Act, 78 Stat. 36—which added § 79 of the Internal Revenue Code, 26 U. S. C. § 79, giving deductions to employees for group term life insurance contributions made by employers, and which created a corresponding deduction in the withholding tax (§ 3401 (a) (14))—actually *contracted* the wage base and this change in withholding obligation was made *retroactive*. See § 204 (d) of the Act, 78 Stat. 37.

In 1965, Congress modified the treatment of tip income under both the Social Security Act and the withholding provisions of the Code. Although the amending legislation was passed in July 1965, the modifications to

In the one instance where this has not been the case,[5] Congress has made clear that its retroactive application of withholding tax changes was inadvertent and it has moved promptly to correct its error:

"The Tax Reform Act of 1976, enacted on October 4, 1976, made several changes which increased tax liabilities from the beginning of 1976.

"In prior legislation (such as the Tax Reform Act of 1969) which the Congress passed late in the year but

withholding did not take effect until January 1, 1966. See Social Security Amendments of 1965, Tit. III, § 313 (f), 79 Stat. 385.

In 1966, Congress amended §§ 3401 (a) (6) and 3401 (a) (7), specifying that withholding on wages paid to aliens would thereafter be governed by Treasury Regulations. See Foreign Investors Tax Act of 1966, Tit. I, § 103 (k), 80 Stat. 1554. This change could have required increased withholding and Congress, apparently recognizing this, delayed the effective date of the change to 1967. See § 103 (n) (4), 80 Stat. 1555. Similarly, in 1972, Congress modified § 3401 (a) (1) of the Code. Again, Congress provided: "The amendments made [to § 3401 (a) (1)] shall apply to wages paid on or after the first day of the first calendar month which begins more than 30 days after the date of enactment of this Act." Pub. L. No. 92–279, § 3 (b), 86 Stat. 125. See also Employee Retirement Income Security Act of 1974, Tit. II, §§ 2002 (g) (7), 2002 (i) (2), 88 Stat. 970–971.

In the Tax Adjustment Act of 1966, Congress made a wholesale modification of the withholding tax tables found in § 3402 of the Code, 26 U. S. C. § 3402. Again, Congress created a grace period—this time of over a month—before the new withholding provisions took effect. See Tax Adjustment Act of 1966, § 101 (g), 80 Stat. 62. Further complex changes in withholding tables that increased withholding for many taxpayers were made in 1969, 1971, and 1976. In each instance but the last, changes were expressly made prospective. See Tax Reform Act of 1969, Tit. VIII, § 805 (h), 83 Stat. 709; Revenue Act of 1971, Tit. II, § 208 (i), 85 Stat. 517. As explained in the text, *infra*, Congress' failure to make the 1976 withholding changes prospective was an oversight and has been corrected.

Thus, although the withholding provisions of the Code have been frequently amended, there is only one instance of intentionally retroactive application of an amendment and in that case the amendment scaled down an employer's withholding obligations.

[5] See n. 4, *supra*.

which imposed tax increases from the beginning of the year, the Congress, *as a matter of equity and custom,* has relieved taxpayers of any liability for additions to tax, interest, and penalties with respect to increases in estimated tax resulting from increases in tax liability . . . . Relying on Congressional assurances that the failure to provide such relief in the 1976 Act was an oversight which would be remedied, the Commissioner [has delayed tax assessments for 1976]. . . .

.           .           .           .           .

"The committee believes it is appropriate to grant to taxpayers affected by the 1976 legislation relief from additions to tax, interest, and penalties, similar to that which has traditionally been granted in connection with earlier legislation where provisions were enacted with retroactive application.

.           .           .           .           .

"[Therefore, t]he committee amendment . . . *relieves employers of any liability for failure to withhold income tax during 1976, on any type of remuneration which was made taxable by the 1976 Act."* S. Rep. No. 95–66, pp. 85–86 (1977) (emphasis added).

See Tax Reduction and Simplification Act of 1977, § 404, 91 Stat. 155–156.

The only conclusion that can be drawn from Congress' consistent practice of avoiding retroactive imposition of withholding tax liability and its recent judgment that "equity and custom" require relief from inadvertent retroactive liability, I submit, is that additional withholding taxes should not, at least without good reason, be assessed against employers who did not know of and who had no reason to know of increased withholding obligations at the time wages had to be withheld.

Such notice, as the Court holds, *ante,* at 25–26, 29–30, was not given petitioner until at least 1967 and, for all that ap-

pears, possibly not until our decision in *Commissioner* v. *Kowalski*, 434 U. S. 77 (1977). Thus, the only question remaining is whether there is here some good reason to depart from customary practice. The United States does not suggest one, arguing instead that petitioner had ample notice of its obligations—a conclusion I join the Court in rejecting. Moreover, unlike the situation in *Dixon* and *Automobile Club of Michigan*, imposition of taxes retroactively here would not serve the important function of ensuring that all similarly situated taxpayers are assessed equally. Instead, the likely effect would be that the individual taxpayers who should have reported these meal reimbursements in income will be relieved of all taxes they should have paid, and petitioner will bear the tax directly rather than simply acting as a collection conduit for the United States, a result certainly not intended by Congress.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring.

In addition to joining the Court's opinion, I also join MR. JUSTICE BRENNAN's concurring opinion addressing the question of retroactive application of the withholding tax. It seems particularly inappropriate for the Commissioner, absent express statutory authority, to impose retroactively a tax with respect to years prior to the date on which taxpayers are clearly put on notice of the liability. In other areas of the law, "notice," to be legally meaningful, must be sufficiently explicit to inform a reasonably prudent person of the legal consequences of failure to comply with a law or regulation. In view of the complexities of federal taxation, fundamental fairness should prompt the Commissioner to refrain from the retroactive assessment of a tax in the absence of such notice or of clear congressional authorization.

As the Court observes, *ante*, at 32, in 1963—the year in question—no regulation or ruling required withholding on any travel expense reimbursement, and the intimations were to the

contrary. It can safely be said that until recently (perhaps until our decision this Term in *Commissioner* v. *Kowalski,* 434 U. S. 77 (1977)), neither employers nor employees generally had notice of the asserted tax consequences of lunch reimbursement. In short, as Mr. Justice Brennan's opinion makes clear, the Commissioner abused his discretion in attempting the retroactive imposition of withholding tax liability.

Mr. Justice Stewart, concurring in the judgment.

Although agreeing with much that is said in the Court's opinion, I join only in its judgment.

The so-called overnight rule of *United States* v. *Correll,* 389 U. S. 299, has nothing whatever to do with the definition of either "income" or "wages." It is exclusively concerned with what deductions employees may take when they prepare their own tax returns.

The obligation of an employer to withhold upon wages depends not at all on what deductions his various employees may eventually report on their individual income tax returns. That is a question about which, as a matter of fact and of law, the employer can neither know nor care. The importation of the *Correll* rule into this case can do nothing, therefore, but confuse the issues actually before us.

I concur in the judgment of the Court because I think the reimbursements here involved were not, at the time they were made, "wages" within the meaning of § 3401 (a) of the Internal Revenue Code of 1954 as interpreted by Treas. Reg. § 31.3401 (a)–1 (b)(2).