The INCORPORATED TRUSTEES OF THE GOSPEL WORKER SOCIETY, Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 85–2119.

United States Court of Appeals, Federal Circuit.

Nov. 20, 1985.

Scott P. Crampton, MacDonald, McInerny, Guandolo, Jordan & Crampton, Washington, D.C., argued for appellant. With him on brief was James M. Havack, Spieth, Bell, McCurdy & Newell Co., L.P.A., Cleveland, Ohio.

Teresa McLaughlin, Tax Div., Dept. of Justice, Washington, D.C., argued for appellee. With him on brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Gilbert S. Rothenberg, Washington, D.C.

Before MARKEY, Chief Judge, MILLER, Senior Circuit Judge, and NIES, Circuit Judge.

JACK R. MILLER, Senior Circuit Judge.

This appeal is from a judgment of the United States Claims Court involving a suit for refund of certain Federal Insurance Contributions Act ("FICA") taxes paid by appellant (hereinafter "Society") for the first calendar quarter of 1978 following rejection by the Internal Revenue Service ("IRS") of its claim for refund on May 17, 1983. The amount claimed was the tax on the value established by IRS of meals and lodging furnished by the Society to eight of its members who performed services for the Society and were paid wages therefor. The FICA taxes paid on those wages are not in dispute.

The tax paid on the value established by IRS of meals and lodging amounted to $1,869.65. The trial court severed the issue of valuation of the meals and lodging, and, following the court's decision on the main issue (inclusion of the value of meals and lodging for FICA tax purposes pursuant to 26 U.S.C. § 3121(a)), the parties settled the valuation issue by reducing the value established by IRS from $15,451.62 to $9,042.15. This resulted in a reduction of the FICA tax attributable to the meals and lodging from $1,869.65 to $1,094.10. The trial court ordered the resulting overpayment of $775.55 to be refunded to the Society. Thus, the amount of tax in dispute is $1,094.10, and the issue before us is the correctness of the trial court's determination that the $9,042.15 value of the meals and lodging is subject to the FICA tax.[1] We affirm.

## BACKGROUND [2]

The Society was organized in 1906, being preceded by an unincorporated membership organization. In 1960 its articles of incorporation were amended to provide, *inter alia:* "The purposes for which said corporation is formed are: (1) to propagate the Christian gospel by means of the printing, publication and dissemination of Christian literature and the maintenance of Missions; (2) to receive and hold property real and personal to be utilized in furtherance of the above purposes." Its members consist of ladies who have subscribed to the tenets guiding the Society and have devoted the better part of their lives to its work.[3]

---

1. Any distinction between gross income under section 119 of the Internal Revenue Code and wages under sections 3101, 3111, and 3121(a) is not at issue in this appeal, both parties having employed the definition of income within the meaning of section 119. *Cf. Rowan Cos. v. United States,* 452 U.S. 247, 254, 101 S.Ct. 2288, 2293, 68 L.Ed.2d 814 (1981).

2. The Claims Court's findings of fact are reported in full at 6 Cl.Ct. 308 (1984) and are based on the testimony of the Society's president and multiple stipulations of the parties. However, only such findings as are deemed important to our decision are set forth herein. We are satisfied that those findings are not clearly erroneous. *Heisig v. United States,* 719 F.2d 1153, 1158 (Fed.Cir.1983); Fed.R.Civ.P. 52(a).

3. The Society has no written document, by-laws, regulations, or contract setting forth an obligation to furnish its members with food, shelter, and clothing. However, the Society contends that the members have agreed to accept care and maintenance during membership and that this has consistently been provided all members in good standing without regard to their physical abilities to perform duties within the Society. Thus, the Society has promised to care for its members during their active and declining years when they have performed services in past years.

Since 1950, the Society has been located in Cleveland, Ohio. This location is the site of its printing operation, its bookstore, and the home it maintains for its 25 members [4] at an annual cost of $500,000.[5] The home consists of three floors and a basement, which contain a chapel, library, dining room, kitchen, laundry, and nursing area. Each member has her own private room. A number of nonmembers are employed in the home (kitchen help, nurses, maintenance and cleaning people). At one time, the Society maintained missions in Cleveland, Youngstown, and Pittsburg, but in 1962 the last mission associated with the Society was closed.

The primary function of the Society has been spreading of the Gospel by the printed page. The Union Gospel Press, which is a divisional operation of the Society, publishes religious literature, including but not limited to a line of Sunday School material. The Society owns and controls the Press operation, and its income is primarily from the sale of religious literature.

The Society's tax-exempt status was revoked retroactive to 1963 on the basis of the decision in *Incorporated Trustees of the Gospel Worker Society v. United States,* 510 F.Supp. 374 (D.D.C.1981), *aff'd mem.,* 672 F.2d 894 (D.C.Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982). There the district court found that "the only discernible activity of the Society, apart from the maintenance of the ladies, was the publication of religious literature through the Gospel Press." 510 F.Supp. at 375–76. For this reason, and because of the substantial profits accumulated by the Society and the substantial salaries of its nonmember officers,[6] the court held that "taken together [these circumstances] present a picture of a publishing enterprise the primary purpose of which is profits, not salvation." 510 F.Supp. at 380.

Julia P. Stabley, the president of the Society, testified that the Society's home and the Press are located on the same grounds and that the members would not be Gospel Workers if they did not live in the home; also, that all of the members were expected to attend religious services in the home, which were held daily for approximately fifteen minutes at 6:30 a.m. and after the evening meal. However, two of the eight ladies involved in this case did not attend these services or the meals except for Sunday dinner. Although the eight ladies received cash wages, not all of the members are employed by the Society and receive wages. If free meals and lodging were not provided, adequate lodging and meals are available nearby. Two of the eight ladies (Anna Bachman and Grace Todd) performed duties in the Press operations, and it was stipulated by the parties that if they did not receive free meals and lodging "there is no question that they could adequately perform [their] duties." As to the other six (Darlene Stepler, Alice Bossard, Grace Gray, Beulah Mann, Vera McKinney, and Grace Wolf), they stated *inter alia* as follows:

Stepler: She worked for the Society as a nurse's aide, usually on an 8-hour day shift (from 8:00 a.m. to 4:00 p.m.) and a 40-hour work week. She received free meals every day of the week; although she occasionally went out to eat, she was not aware that the Society would have minded if she ate out frequently. She was never called out of a meal to handle an emergency and was never asked to drive someone to the hospital or to drive anywhere at night. After working hours she was not on call, and her free time was her own.

Bossard: The nature of her duties (managing the guest rooms and supply room) was not such as to require her to

---

**4.** Membership declined from 80 in 1930 to 25 in 1978, when the average age was about 70.

**5.** The Society's Employer's Quarterly Federal Tax Return for the first quarter of 1978 shows total wages paid of $226,778.62.

**6.** As of 1978, the Society's accumulated surplus exceeded $5.3 million, and its top three officials, who were nonmembers, received annual salaries of over $103,000, $72,000, and $42,000, respectively.

live in the Society's home; she lives there because she regards it as her home.

Gray: Her duty was to work in the laundry room in the morning, and she could go out to eat if she wished.

Mann: She worked a half-day shift in the Treasurer's office in the home, paying the bills, and she could perform her duties properly if she did not live in the home.

McKinney: She worked a five-day work week doing accounting work as an assistant treasurer in the home and could perform her duties adequately if she did not live in the home.

Wolf: She worked a half-day (from 1:00 p.m. to 4:00 p.m.) at the reception desk. She could eat out if she wished and did not have to ask permission to do so. Meals were provided to promote the morale or goodwill of the ladies.

Thus, of the eight ladies involved here, five stated that they could have performed their services adequately without living in the home.[7]

## ANALYSIS

■ The Society argues that the lodging and meals of the eight ladies here involved were required (by "the communal manner of living required by the Society for its members") to enable them to perform their services, so that the "condition of employment test" has been met and, therefore, the "convenience of the employer" test has also been satisfied. However, this ignores the distinction between condition of employment, which is essential to the proper performance of employment services,[8] and condition of membership which, assuming *arguendo* there is such a condition, applies alike to members who perform services and receive wages and those who do not. 26 C.F.R. § 1.119–1(b) (the requirement that an employee must accept lodging on the business premises of the employer as a condition of employment "means that he be required to accept the lodging in order to enable him properly to perform the duties of his employment").

■ The Society further argues that the requirement that members live in the home is "integrally related to the duties to be performed," citing the dormitory counselors in *Bob Jones University v. United States,* 670 F.2d 167, 229 Ct.Cl. 340 (1982), whose lodging was held to qualify for the exclusion benefit of 26 U.S.C. § 119.[9] However, although it may be that the eight ladies here involved are more nearly comparable to the dormitory counselors than the faculty and staff in that case, there is no showing that the dormitory counselors could have adequately performed their services without living in the dormitories.[10]

---

**7.** The other three ladies did not address this point in their depositions, but we are persuaded that the nature of their services was such as to support an inference that these could be performed without living in the Society's home.

**8.** The wages of the eight ladies involved demonstrate a clear nexus between their services and the business activities of the Society. Wages reported for 1978 were: Bachman $11,921.89; Todd $10,233.57; Stepler $3,776.66 (May thru December); Bossard $6,344.24; Gray $2,054.24; Mann $2,826.44; McKinney $17,309.79; and Wolf $2,354.24.

**9.** 26 U.S.C. § 119 provides, in part, as follows:
    (a) *Meals and lodging furnished to employee ... pursuant to employment*
  There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him ... by or on behalf of his employer for the convenience of the employer, but only if—

    (1) in the case of meals, the meals are furnished on the business premises of the employer, or
    (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.
Our predecessor court has stated that "There does not appear to be any substantial difference between the ... 'convenience of the employer' test and the 'required as a condition of his employment' test." *United States Junior Chamber of Commerce v. United States,* 334 F.2d 660, 663, 167 Ct.Cl. 392 (1964).

**10.** We note that the mere assertion that meals were furnished for a noncompensatory business reason of the employer (and, therefore, were for the convenience of the employer), 26 C.F.R. § 1.119–1(a)(2)(i), is not sufficient proof since this is a question of fact to be determined from the circumstances of each case.

■ The Society also argues that Congress has indicated its dissatisfaction with the holding in the *Bob Jones University* case that faculty and staff members of the university were not entitled to exclude from income the fair market value of university-provided meals and lodging from their gross income, where contacts between students and such faculty and staff members were not measurably greater than contacts between students and faculty and staff members who lived off campus. It cites (1) the Senate Committee Report (No. 98–148, 98th Cong., 1st Sess.) accompanying the Supplemental Appropriations Bill for 1983, declaring that the Committee believes that the IRS efforts to impose withholding taxes on educational institutions is contrary to the 1978 statement of the Supreme Court in *Central Illinois Public Service Co. v. United States,* 435 U.S. 21, 31, 98 S.Ct. 917, 922, 55 L.Ed.2d 82 (1978) ("it is a matter of obvious concern that, absent further specific congressional action, the employer's obligation to withhold be precise and not speculative"); and (2) section 531(e) of the Deficit Reduction Act of 1984, which added section 4977 to the Internal Revenue Code providing a moratorium on issuance of regulations covering taxation of "qualified campus lodging." [11] However, we do not view such "dissatisfaction" of Congress as relevant to this case, much less as constituting an implied repeal of the statute as interpreted in the *Bob Jones University* case. *See Allen v. McCurry,* 449 U.S. 90, 99, 101 S.Ct. 411, 417, 66 L.Ed.2d 308 (1980) (repeals by implication disfavored). The "concern" of the Supreme Court arose in a case involving withholding of tax on lunch expense reimbursement in 1963 when "not one regulation or ruling" required withholding on any travel expense reimbursement—a circumstance not present here.

■ Considering the stipulation, "If they [employee/members] did not receive free meals and lodging, there is no question that they could adequately perform the duties that they perform in the Press operations," and evidence showing that services in the home could be adequately performed if free meals and lodging were not provided,[12] we conclude that the Society has failed to sustain its burden of proving that the IRS determination is erroneous. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935).

In view of the foregoing, we hold that the fair market value of the meals and lodging furnished by the Society to the eight ladies here involved is includible in wages for purposes of FICA taxes, said meals and lodging not having been furnished for the convenience of the employer-Society within the meaning of 26 U.S.C. § 119.

Accordingly, the decision of the Claims Court must be *affirmed.*

AFFIRMED.

---

**11.** The Society acknowledges that the Conference Report thereon states that no inference is intended of the correct tax treatment of such lodging before the moratorium period beginning January 1, 1984.

**12.** We note that 26 C.F.R. § 1.119–1(a)(2)(iii) provides that promotion of morale or goodwill of the employee by furnishing meals is regarded as a compensatory business reason of the employer.